AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Maryland

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| RICKY EVANS, a/k/a "Dorsey" | ) | Case No.  **17 - 0 8 3 6 - ADC** |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 2016 through March 2017___ in the county of _____ in the
_____ District of ___Maryland___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | Conspiracy to Distribute Controlled Substances |
| 18 U.S.C. 922(g) | Possession of a Firearm by a Prohibited Person |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Troy Dannenfelser
*Printed name and title*

Sworn to before me and signed in my presence.

Date: *16 March 2017*

_____
*Judge's signature*

City and state: ___Baltimore, Maryland___

A. David Copperthite, U.S. Magistrate Judge
*Printed name and title*

17 - 0 8 3 6 - ADC

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Troy A. Dannenfelser, Special Agent with the United States Bureau of Alcohol Tobacco Firearms and Explosives (hereinafter "ATF"), being duly sworn, depose and state:

1.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the ATF, and have been so since 2003.  I am currently assigned to a joint task force comprised of ATF agents and detectives from the Baltimore Police Department (BPD).  I have participated in numerous investigations focusing on Controlled Dangerous Substance (CDS) trafficking, home invasions, gangs and illegal firearms.  I have conducted covert surveillance of suspected CDS traffickers, interviewed numerous individuals involved in gangs and the CDS trafficking trade, participated in several Title III wiretap investigations as an affiant, monitor and member of surveillance teams, participated in the execution of numerous state and federal search and arrest warrants involving CDS traffickers and violent offenders, to include home invasion crews, and participated in the seizure of numerous firearms and controlled dangerous substances.  Through my training, education and experience, I have become familiar with the manner in which illegal CDS are transported, stored, and distributed, the methods of payment for such CDS, and the manner in which CDS traffickers communicate with each other.

3.      I have participated in the execution of numerous search and seizure warrants pertaining to CDS.  As a result, I have been involved in the seizure of heroin, marijuana, cocaine, fentanyl, prescription drugs, packaging materials, and firearms.   I have also participated in

1

numerous debriefings of narcotic traffickers, cooperating individuals, and sources of information. During these debriefings, I have become familiar with brand names and terminology used by drug dealers.

4.      I have participated in other wiretap investigations as a member of the surveillance team or as a monitor, where I have had the opportunity to listen to and interpret thousands of phone calls as they pertained to various aspects of the illegal narcotics trade.

5.      Through training and experience in drug trafficking investigations and arrests, I have become familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the Internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions.  Based on this familiarization, I know the following:

      a.      Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses.  Drug trafficking is an illicit commercial activity that is characterized by regular, repeated criminal activity;

      b.      Drug traffickers and members of the organization arm themselves and their organization with firearms to protect their drug trafficking activities; additionally, it is common for drug dealers to conceal contraband, firearms, and proceeds of drug sales in secure locations within their residences, vehicles and/or business for ready access;

      c.      Drug traffickers commonly compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell.  In that regard, I know that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization, and ultimately frustrating law enforcement efforts to dismantle the entire organization;

      d.      Cellular telephones are an indispensable tool of the drug trafficking trade. Drug traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators.  In addition, drug traffickers will often change their cellphones following the arrest of a member of their drug trafficking organization (DTO), or at random times in order to frustrate law enforcement efforts;

e.     Drug traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

6.     This Affidavit is submitted in support of a Criminal Complaint charging Ricky

EVANS, a/k/a "Dorsey," with conspiracy to distribute controlled substances, in violation of Title

21 of the United States Code, Section 846 and possession of a firearm by a prohibited person in

violation of Title 18 of the United States Code, Section 922(g)(1).  Because this Affidavit is

submitted for the limited purpose of establishing probable cause in support of the Criminal

Complaint, it contains only a summary of relevant facts.  I have not included each and every fact

known to me concerning the entities, individuals, and the events described in this Affidavit, but I

have not excluded any facts known to me that would defeat a finding of probable casuse.

7.     The statements made in this Affidavit are based in part on: (a) my personal

participation in this investigation; (b) information provided to me by other law enforcement

officers; (c) information provided to me and other law enforcement officers by confidential sources

of information; (d) review of intercepted, monitored, and/or recorded conversations; (e) criminal

history records maintained by various law enforcement agencies, the Baltimore Police Department

("BPD") and the National Criminal Information Center ("NCIC"); and (f) the training and

experience of myself and other law enforcement agents and officers.

## PROBABLE CAUSE

8.     In July 2015, the ATF began an investigation of an armed drug trafficking

organization ("DTO") selling heroin to retail customers from an open-air drug "shop" operating

near the corner of Monument and Rose Streets in Baltimore City, Maryland.  Based on evidence

gathered to date, investigators believe that the DTO is led by Ricky EVANS, a/k/a "Dorsey."

EVANS is also believed to be a high-ranking member of the Black Guerilla Family street gang ("BGF"). It should also be noted that EVANS is a convicted felon and prohibited from possessing firearms.

9.      As part of the investigation, agents identified 5208 Loch Raven Boulevard Apartment E, the (**LOCH RAVEN PREMISES**), as a residence for EVANS.  On November 23, 2016, investigators conducted surveillance of EVANS at the **LOCH RAVEN PREMISES**.  At approximately 10:08 a.m., investigators were on scene and observed a black Chrysler 300 sedan bearing Maryland tags 5CA1234, rented by Sherri JORDAN (JORDAN), who is EVANS's girlfriend, and who has been observed throughout the investigation renting various vehicles used by EVANS and others.  The utilities for the **LOCH RAVEN PREMISES** are in the name of Sherri JORDAN.

10.      While at the **LOCH RAVEN PREMISES**, EVANS exited the passenger side of the Chrysler 300 and then entered the apartment building. On November 23, 2016, a little over half an hour later, at approximately 12:39 p.m., investigators observed JORDAN arrive in the black Chrysler 300 and remove a gray plastic bag. JORDAN proceeded to enter the **LOCH RAVEN PREMISES**, and left the Chrysler 300 running on Loch Raven Boulevard with the blinkers on. At approximately 12:43 p.m., investigators observed EVANS and a younger black male exit the **LOCH RAVEN PREMISES**. The younger black male placed a white trash bag and yellow grocery-style plastic bag into the trunk of the Chrysler 300 and then returned to the building. EVANS continued into the driver's seat of the Chrysler 300 then departed the area.

11.      Based upon my training and experience, and knowledge gained throughout this investigation, I believed that EVANS was removing narcotics from the **LOCH RAVEN PREMISES** and loading them into the trunk of the Chrysler 300 to supply an individual that

EVANS spoke to over the phone.

12.     As the investigation progressed, EVANS began traveling to 905 N. 20th Street, Apartment A, in Richmond, VA (the **RICHMOND PREMISES**).

13.     On February 14, 2017, a United States Magistrate Judge in the District of Maryland authorized the installation and use of GPS tracking device on a silver Mercury sedan with Maryland tags 5CT9667 used by EVANS.  The device was installed on February 15, 2017.

14.     On February 17, 2017, the Honorable George L. Russell IIII, authorized the interception of wire and electronic communication over 443-599-2284 (**TARGET TELEPHONE 4**)[1], a phone used by EVANS.

15.     On February 21, 2017 at approximately 12:39 p.m., EVANS received a call from 681-242-7534, used by an unknown male (UM7534).  The following is a transcript of the call:

UM7534:     What's up, fam?

EVANS:      What's up, fam?

UM7534:     Chillin', chillin', just lettin' you know everything everything. [Third party in the background: [*unintelligible*]].

EVANS:      A'ight, you, you ready, you ready for me to come that way?

UM7534:     Yeah, yeah, yeah. 'Ey, 'ome [*phonetically*]…'ey, homes [*phonetically*], I mean, I know you can't do nothin' different about it, for real, for real, but everybody ain't really like the last batch, yo. [Third party in the background: Cut [*phonetically*]].

EVANS:      Oh, à'ight. A'ight. [Voices overlap]

UM7534:     They said it was mad c-, they said it was mad cut in there or somethin', and…. [Third party in the background: [*unintelligible*]].

---

[1]        In conjunction with the interception of wire and electronic communication over **TARGET TELEPHONE 4,** Judge Russell authorized law enforcement's receipt of real-time GPS information for **TARGET TELEPHONE 4.**

EVANS:         A'ight, um…. [Pause]

UM7534:        I mean, for real, for real, I mean, if it comes, if that's what it gotta be, for real, for real, it is what it is. It's gonna move anyway, for real, for real. I'm just lettin' you know…. [Third party in the background: We don't want it.]

EVANS:         Yeah, because that's—I mean…that was, that was, that was, that's all that been around right now.

UM7534:        [*unintelligible*]. [Voices overlap]

EVANS:         But, I mean…I mean, this prob'ly a little [*unintelligible*]—I'll, I'll see you when I get down there. I'll talk to you in a little bit.

16.    Based upon my training and experience, I believed that in this call EVANS and UM7534, who was calling EVANS from a West Virginia area code, were trying to make arrangements to conduct a drug transaction. EVANS asked, "you ready for me to come that way". UM7534 agreed ("yeah, yeah, yeah"), but then complained about the quality of a previously supplied batch of heroin ("everybody ain't really like the last batch"). UM7534 told EVANS that there was too much cutting agent used in the batch ("it was mad cut in there or somethin'"). I know that drug traffickers, like EVANS, often mix cutting agents, like mannitol, caffeine, or other substances, into the heroin to increase the volume of the substance available for sale. By adding cutting agents; however, the purity of the heroin is decreased and the effect caused by the heroin, when consumed, is diminished. EVANS explained to UM7534 that the lower quality heroin was all that he had available ("that's all that been around right now").

17.    At the time of this call, the GPS location data placed **TARGET TELEPHONE 4** at the **RICHMOND PREMISES.** Following the conversation, I was able to observe the GPS location data for **TARGET TELEPHONE 4** leave the **RICHMOND PREMISES**, at approximately 2:15 p.m. At approximately 5:07 p.m., the location data placed **TARGET**

6

TELEPHONE 4 on West King Street in Martinsburg, West Virginia. I, therefore, believe that EVANS left the **RICHMOND PREMISES** to conduct the drug transaction in West Virginia.

18.     On February 24, 2017, at approximately 5:45 p.m., investigators observed EVANS, wearing a grey sweatsuit, exit the **LOCH RAVEN PREMISES** with an unknown female and depart the area in the silver Mercury Sable.

19.     On February 26, 2017 at approximately 2:54 p.m., EVANS received a call over **TARGET TELEPHONE 4** from an unknown male utilizing telephone number 804-300-5599 (UM5599). During the conversation, EVANS advised UM5599 "ready to come that way in about a couple of hours." UM5599 advised EVANS that he was getting things together for him and that "I be ready about another day." To which EVANS replied, "Alright, I be ready to see you then tomorrow."

20.     On February 27, 2017 at approximately 8:09 p.m., EVANS placed an outgoing telephone call to UM5599. During the conversation, EVANS told UM5599 that he (EVANS) was about 45 minutes away from Richmond [after leaving Baltimore]. UM5599 advised EVANS that should give him "plenty of time to do what I got to do." EVANS replied that he would contact UM5599 "as soon as I step foot in." At approximately 8:54 p.m., EVANS called UM5599 and advised UM5599 that he (EVANS) had arrived and to bring EVANS's uncle a pack of cigarettes. Additionally, EVANS told UM5599 that he (EVANS) was not staying, that "I was only coming up to holler at you. Yeah, I was coming to holler at you. I wasn't stayin'." A review of EVANS's GPS data showed that at the time of this call he was at 920 N. 20th Street, Richmond, Virginia, in the same block as the **RICHMOND PREMISES**.

21.     On February 27, 2017 at approximately 8:55, EVANS sent a text message to 304-240-6588, used by Albert BYRD. The text read: "What's up Slim." At approximately 9:05 p.m.,

EVANS sent a text message to 304-240-4889, used by Kana KENNEDY. The text read: "Yo." Both BYRD and KENNEDY are believed to be heroin purchasers in Martinsburg, West Virginia, and were arrested together on February 10, 2017 by the West Virginia State Police in possession of approximately one gram of heroin, and a set of digital scales.

22.     On February 27, 2017 at approximately 9:08 p.m., EVANS called 304-283-2556 used by Richard SHORT, a/k/a "R." The following is a transcript of the call:

SHORT:      What's up Dayday?

EVANS:      What's up, you ain't never called me back man. You be playing.

SHORT:      Where you at? Nah, man. Where you at? What's up?

EVANS:      I'm about to come down man but you [stammers] — [Voice Overlap]

SHORT:      I thought you were here already. My bad bro, I got so much shit going on dog. I got court tomorrow, and shit—but I'm trynna' see you tonight though.

EVANS:      A'ight man, uhm, is you sure though man? Cause I'mma be there in a couple—

[Voices overlap]

SHORT:      [mumbles] what I'mma do, I'mma give you what I owe you for that thing and make that right and then I'll probably only have like another hundred man cause I only got like a buck something—I got a little bit of work but if I can move a good bit, you know what I'm saying, but I'm saying right now as we speak I got two hundred right now.

EVANS:      Alright, well—a'ight, I'll be there in a couple of hours so you'll probably have more then yo.

SHORT:      Yeah I'll probably will.

8

EVANS:      A'ight, a'ight.

SHORT:      A'ight. So—you got me right?

[Voices overlap]

EVANS:      Yeah. You still in Charlestown?

SHORT:      I'm at, I'm at—I'm in Charlestown at the, at the uh Knights Inn. It's between McDonalds and uhm, KFC.

EVANS:      A'ight, a'ight cool Okay.

SHORT:      Okay?

EVANS:      Alright.

SHORT:      You got me right?

23.     Based upon my training and experience, I believed that EVANS had acquired a quantity of heroin in Baltimore and advised UM5599 that he (EVANS) was coming to Richmond to "see him," which I interpreted to mean provide drugs. Once in Richmond, EVANS then called customers, BYRD, KENNEDY and SHORT, in West Virginia to advise them that he (EVANS) had drugs available. EVANS actually told SHORT that he was "about to come down." SHORT then explained how much money he (SHORT) had available to pay off a previous debt and purchase more heroin ("I owe you for that thing and make that right and then I'll probably only have like another hundred man cause I only got like a buck something—I got a little bit of work but if I can move a good bit").

24.     On February 27, 2017 at approximately 9:13 p.m., EVANS received a text from KENNEDY, "I have no money im too sick to even husle jon pls help me man."  In this call, KENNEDY informed EVANS (whom she knows as "jon") that she was "sick" (having heroin

9

withdrawal), and too sick to "husle" (sell drugs). She then begged EVANS to provide her some heroin to aid her withdrawal symptoms ("pls help me").

25.     Following these calls, at approximately 10:42 p.m., the GPS tracking device on the EVANS's Mercury showed that he had left Richmond, Virginia and was traveling toward Martinsburg, West Virginia. At approximately 12:22 a.m., on February 28, 2017, EVANS received a text message from SHORT, "Charlestown w.v.knights inn rm 261…", which I believed to be the location for the drug transaction.

26.     Law enforcement had established surveillance at this location, based upon the previous intercepts, and at approximately 1:15 a.m., agents observed EVANS arrive in his Mercury and enter a room on the second floor of the Knights Inn, 642 E. Washington St., Charles Town, WV 25414. EVANS exited the room at approximately 1:23 a.m., and left the area.

27.     On February 28, 2017 at approximately 3:05 a.m., the GPS of EVANS's Mercury placed the vehicle briefly at North Patterson Park Avenue and Orleans Street in Baltimore City.

28.     Based upon my training and experience, I believed that EVANS entered the Knights Inn to conduct a drug transaction with UM5599 on his way to Baltimore after leaving the **RICHMOND PREMISES.**

29.     On March 2, 2017, the Honorable Stephanie A. Gallagher authorized a search and seizure warrant for the **LOCH RAVEN PREMISES**, and on March 3, 2017, a United States Magistrate Judge in the Richmond, Virginia authorized a search and seizure warrant at the **RICHMOND PREMISES**.

30.     On March 16, 2017, the search warrants were executed at both locations. EVANS was arrested in the **RICHMOND PREMISES** and approximately one ounce of suspected heroin was seized from that location, along with a pressing device for drugs, cutting agent, suspected

17 - 0 8 3 6 - ADC

BGF documentation and $3700.   At the **LOCH RAVEN PREMISES,** agents discovered EVANS's teenage son, empty gelatin capsules, a grinder and sifter with suspected heroin residue $2700 in counterfeit $100 bills and a stolen M4 assault rifle, which was not manufactured in the State of Maryland, and therefore affected interstate commerce prior to its recovery at the **LOCH RAVEN PREMISES**.

31.     Based upon the foregoing, I believe that probable cause exists to charge Ricky EVANS, a/k/a "Dorsey," with conspiracy to distribute heroin, in violation of Title 21 of the United States Code, Section 846 and possession of a firearm by a prohibited person in violation of Title 18 of the United States Code, Section 922(g)(1).

Troy A. Dannenfelser
Special Agent, ATF

Sworn to and subscribed before me this 16th day of March, 2017.

A.  David Copperthite
United States Magistrate Judge